IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 16, 2006 Session

## STATE OF TENNESSEE v. JEFFERY TODD EPPS

**Direct Appeal from the Circuit Court for Sevier County**
**No. 9678    Richard R. Vance, Judge**

---

**No. E2005-01917-CCA-R3-CD Filed September 19, 2006**

---

The appellant, Jeffery Todd Epps, was convicted by a jury in the Sevier County Circuit Court of reckless aggravated assault. The trial court sentenced the appellant as a Range II multiple offender to eight years incarceration in the Tennessee Department of Correction. On appeal, the appellant contends that the trial court erred in sentencing him to the maximum sentence within the range. Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Wade V. Davies, Knoxville, Tennessee, for the appellant, Jeffery Todd Epps.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Al Schmutzer, Jr., District Attorney General; and Steven R. Hawkins, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

The appellant was indicted for the intentional or knowing aggravated assault with a deadly weapon of the victim, Jeffrey David Enloe. At trial, Enloe testified that in September 2002, he, his wife, and his two small children vacationed in Pigeon Forge, staying at a Best Western motel. The family had been at the motel a couple of days, during which time Enloe met and "made acquaintances" with the appellant. Enloe and the appellant saw each other off and on during the course of their stay. Enloe stated that he was approximately six feet tall, and the appellant was a small man, maybe five feet, three inches tall.

On the afternoon of September 21, 2002, the victim and the appellant drove to the grocery

store to buy groceries and beer. Enloe drove his Jeep Grand Cherokee. During the drive, Enloe showed the appellant a new Boker hunting knife that Enloe had recently purchased in Pigeon Forge. The knife, a "two-blade, fold-up knife" with five and a half-inch or six-inch blades, was packaged in an unmarked brown or dark gray box. After showing the appellant the knife, Enloe put it on the console between the front seats. Enloe also showed the appellant his handgun, an "AMT stainless .22 Magnum." Before replacing the gun in its holster, Enloe unloaded the gun and then reloaded it in a demonstration for the appellant. Afterward, Enloe placed the gun on or beside the console.

When the men returned to the motel with their groceries, they went to their respective rooms. Enloe locked the Jeep before he left, but he did not notice if his knife was still in the Jeep. Enloe went to his room to spend time with his wife and children. The family went swimming. A couple of hours later, the family returned to the room for bed. After returning to the room, Enloe decided to sit by the pool. While at the pool, Enloe saw the appellant. The men sat together, talking and drinking beer. Enloe stated that he had been drinking fairly steadily throughout the day. He said that he was "not slobbering drunk," but he had consumed several beers. The appellant was drinking as well; however, Enloe opined that the appellant did not appear to be intoxicated.

Enloe stated that it was probably after midnight when he got ready to return to his room. Before going to the room, he went to his Jeep to retrieve his knife because he wanted to pack the knife away. The appellant walked with Enloe to the Jeep. Enloe unlocked the Jeep and looked inside; however, he was unable to find the knife. Enloe asked the appellant to help him look in the Jeep for the knife, but the men were unable to find it. Enloe stated that his wife did not have a set of keys to the Jeep and no windows were broken out of the Jeep; therefore, the appellant was the only person he could think of that could have taken his knife. Enloe asked the appellant if he had taken the knife. The appellant said no. Enloe remarked that something was not right about the situation, and he noticed that the appellant "kept wanting to meander." Enloe repeatedly yelled for security to come to the area. As the appellant was attempting to walk away, Enloe pulled his gun from the Jeep. He said that he did not point the gun at the appellant, who was standing twenty or twenty-five feet away, nor did he threaten the appellant with the gun. The appellant asked Enloe if he was going to shoot the appellant. Enloe responded that he would not shoot the appellant. Enloe then put his gun under a seat in the Jeep and shut the door. Enloe stated that the appellant watched him put the gun in the Jeep.

The appellant started walking briskly to the back of the motel, presumably to his room. Enloe did not want the appellant to leave his sight "because he got the knife. I did not want him to go back to the room and discard the knife." Enloe followed the appellant, pleading with him to wait and resolve the matter. When they reached the back parking lot of the motel, which was seventy-five or one hundred yards away from the Jeep, Enloe grabbed the appellant by his shoulder to turn him around. Enloe testified, "I wasn't a-playing when I got a-hold of him." Enloe recalled, "Then I commenced to getting stuck."

Enloe and the appellant wrestled, and Enloe fell to the ground. Enloe could not recall if the appellant fell as well. While they wrestled, Enloe lost the Dale Earnhardt, Jr. racing cap he was

wearing, and he lost his shoes when he kicked at the appellant. During the struggle, the appellant stabbed Enloe six times. Specifically, Enloe remembered that one stab "bowed up on my chest plate. And you talk about hurting; now, that hurt." Additionally, Enloe recounted that "I got stuck right here and took a lung out . . . . And that took the wind out of my sails." Enloe opined that the appellant did not stab him with the Boker hunting knife because the wounds from that knife would have killed him.

After the stabbing, the appellant walked away. Enloe said, "Every time my heart was a-beating I was a-squirting blood." Enloe stated that he believed he might die as a result of his wounds. Enloe managed to stand. He said that he needed to use a hand to "hold[] my guts in" because his intestines "did run out. I kept it in there with my hand." Enloe walked to the motel office, still bleeding profusely. Enloe denied ever returning to his Jeep. When Enloe reached the office, he laid down on the floor. People brought blankets and towels to help until the emergency medical service (EMS) arrived. He told the people that he had been stabbed by "Todd" from South Carolina whose room was on the back side of the building.

Police and EMS arrived, and Enloe was transported by ambulance to the University of Tennessee Hospital. As a result of the stabbing, Enloe had a collapsed lung. Additionally, doctors performed exploratory surgery to determine the extent of his internal injuries. Enloe spent five days in the hospital. One week after he was released, Enloe was forced to return to the hospital because of a staph infection. His lung collapsed again, and more surgery was performed. He was released from the hospital after nine days. He said that he needed additional surgery to correct a hernia that resulted from the first operation.

Lori Armstrong, a night auditor at the Best Western Plaza Motel in Pigeon Forge, testified that she was working at the front desk in the early morning hours of September 22, 2002. A security guard was sitting in a chair facing the desk while another security guard, Mark Owenby, was patrolling the premises. Armstrong looked up and saw Enloe coming toward her, blood covering his chest. The security guard encouraged Enloe to lie down and stay calm. Armstrong called 911. Enloe said that he had been stabbed three times by a man named "Todd" and that "Todd" had stolen a knife from him.

Armstrong said that Enloe was bleeding badly, and she was afraid. The police and an ambulance arrived in response to the 911 call. Armstrong recalled that the registration did not show a "Todd" from South Carolina; however, she gave the police all the information she had concerning registrants from South Carolina. The police thoroughly searched the premises for evidence relating to the stabbing.

Armstrong stated that no one had called in to report a stabbing. Additionally, she stated that she did not hear anyone calling for help prior to Armstrong's arrival in the office. However, she noted that if someone called for help from the back parking lot of the motel, she would have been unable to hear them.

Helen Wright, a patrol officer with the Pigeon Forge Police Department, testified that in the early morning hours of September 22, 2002, she responded to a call to the Best Western motel. She was the second officer to arrive on the scene; Corporal David Wear arrived first. When Officer Wright walked into the office of the motel, Enloe was lying on the floor. He was conscious and alert. Officer Wright recalled that Enloe said he had been stabbed by a white male from South Carolina named "Jeff" or "Jeffrey." Officer Wright said that the police were able to locate a suspect, and Corporal Wear went to the suspect's room.

Officer Wright contacted Enloe's wife, informed her of Enloe's injuries, and asked that she come to the office. When Mrs. Enloe arrived, Enloe was on a stretcher, about to be transported to the hospital. After Enloe left for the hospital, Mrs. Enloe showed Officer Wright the Enloes' Jeep and gave her permission to search the vehicle. Officer Wright noted that the blood trail marking Enloe's path from the back parking lot to the office did not pass anywhere near the Jeep. Officer Wright searched the Jeep and found a holstered .22 caliber loaded pistol underneath the passenger seat. There was no blood on the gun. Officer Wright said that police did not discover the knife used in the stabbing or the stolen knife. She said that there was a huge area where the knife or knives could have been thrown or hidden, including the Pigeon River which ran directly behind the motel.

David Wear, a corporal with the Pigeon Forge Police Department at the time of the shooting, testified that in the early morning hours of September 22, 2002, he responded to a call reporting a stabbing or assault at the Best Western motel in Pigeon Forge. He entered the office of the motel and found a male victim on the floor. The victim was lying on the floor bleeding from puncture wounds to his abdomen and to his face. Corporal Wear said that Enloe was covered in "quite a bit of blood," but Enloe was able to converse with him. Enloe stated that he had been hanging out with a man named "Todd" all day, and the man had stabbed him after they got into an argument.

Corporal Wear testified that the police checked all of the rooms registered to people who were from South Carolina. At one of the rooms, an older couple answered the door. Corporal Wear told them that there had been an assault at the motel, and he needed to come in and talk with them. Corporal Wear walked into the room and noticed the lights were off. He also observed that someone was on the bed to his left, completely covered with a bedspread. Corporal Wear asked the couple who was in the bed, and they acted like no one was there. Corporal Wear became suspicious and discovered the appellant in the bed. The appellant sat up in bed with his hands out. He was fully dressed in street clothes. Corporal Wear took the appellant into custody. Ultimately, Corporal Wear turned the investigation over to Detective Kenny Bean.

Kenny Bean, a detective with the Pigeon Forge Police Department, testified that he arrived at the Best Western motel at 2:02 a.m. on September 22, 2002. Police searched the entire area for weapons, but the only weapon found was Enloe's gun.

Detective Bean said that the appellant was arrested and advised of his rights. Detective Bean said that the appellant did not seem shaken after the incident. Detective Bean asked the appellant about abrasions he had on his hands and elbows. The appellant explained that the wounds came

from diving in a shallow pool. Detective Bean also noticed an abrasion on the appellant's neck; however, the source of that abrasion was not explained. Detective Bean had Officer Wayne Knight photograph the abrasion on the appellant's neck.

The appellant gave a statement to Detective Bean regarding the incident. The appellant told Detective Bean that he had met Enloe the day before the incident. The appellant said that on the day of the stabbing, he and Enloe went to the store and bought beer. The men sat around, talking and drinking beer. They did not argue. Thereafter, they parted ways to go to their rooms. When they met again later that day, Enloe pulled a gun from the back of his pants and told the appellant, "I'll blow a hole in you." The appellant said that Enloe "became violent" and started "acting crazy." The appellant was frightened. The appellant said that Enloe cocked the gun, a "semi-automatic, on top was a slide like a .9 millimeter." The appellant stated that Enloe had already pulled a knife on the appellant as well, but he dropped the knife. The appellant knocked the gun from Enloe's hand, picked up the knife, and stabbed Enloe. He did not know how many times he stabbed Enloe. The appellant maintained that he dropped the knife after stabbing Enloe; therefore, the knife he used should be in the vicinity of the stabbing. The appellant also said that he walked away after stabbing Enloe. He thought about calling an ambulance, but he did not. He went to his room and told his mother and father that a man had pulled a gun on him, and the appellant stabbed him.

Detective Bean said that the police never found the gun the appellant claimed he knocked out of Enloe's hand nor did police find the knife he claimed to have dropped. Detective Bean said that the only weapon the police recovered was the gun that was found in Enloe's Jeep. However, Detective Bean acknowledged that except for the caliber, the appellant correctly described Enloe's gun as a semi-automatic with a slide on top.

Officer Wayne Knight, an evidence technician with the Pigeon Forge Police Department, testified that he viewed the motel office and the scene of the stabbing. He observed a "clear and apparent" blood trail leading from the site of the stabbing to the office. The trail did not lead to Enloe's Jeep. The blood trail consisted of "quite a bit of blood," and the amount of blood increased as the trail approached the office. Officer Knight surmised that Enloe's bleeding increased or that his clothes became saturated with blood which dripped to the ground.

Officer Knight stated that the police did not find any knives during their search. The only gun police found was in Enloe's Jeep. Officer Knight found Enloe's cap and shoes at the scene of the stabbing. Officer Knight took a video tape and numerous photographs of the scene. Later, he photographed a scratch on the appellant's neck.

The appellant did not testify nor did he present any other proof.

Based upon the foregoing evidence, the jury found the appellant guilty of the lesser-included offense of reckless aggravated assault. The trial court sentenced the appellant as a Range II offender to eight years incarceration. On appeal, the appellant contends that the trial court erred in finding the existence of certain enhancement factors without an admission by the appellant or a finding by

the jury in contravention of <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004), and in imposing the length of his sentence.

## II. Analysis

### A. <u>Blakely</u>

On appeal, the appellant contends that the trial court erred in applying certain enhancement factors that were not admitted by the appellant or found by a jury, in violation of <u>Blakely v. Washington</u>, 542 U.S. 296, 124 S. Ct. 2531 (2004). In <u>Blakely</u>, the Supreme Court concluded that the "'statutory maximum' for <u>Apprendi</u>[v. New Jersey, 530 U.S. 466, 120 S. Ct. 2348 (2000)] purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" <u>Blakely</u>, 542 at 303, 124 S. Ct. at 2537. However, recently in <u>State v. Gomez</u>,163 S.W.3d 632, 661 (Tenn. 2005), a majority of our supreme court concluded that, unlike the sentencing scheme in <u>Blakely</u>, "Tennessee's sentencing structure does not violate the Sixth Amendment." Thus, we must conclude that the trial court did not err in failing to submit the enhancement factors to the jury for their determination. The appellant is not entitled to relief on this basis.

### B. Length of Sentence

The appellant also challenges the length of the sentence imposed by the trial court. Appellate review of the length, range or manner of service of a sentence is de novo. <u>See</u> Tenn. Code Ann. § 40-35-401(d) (2003). In conducting its de novo review, this court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statement by the appellant in his own behalf; and (7) the potential for rehabilitation or treatment. <u>See</u> Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); <u>see also</u> <u>State v. Ashby</u>, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. <u>See</u> Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Because the record reveals that the trial court adequately considered sentencing principles and all relevant facts and circumstances, this court will accord the trial court's determinations a presumption of correctness. <u>Id.</u> at (d); <u>Ashby</u>, 823 S.W.2d at 169. As long as our review reflects that the trial court's findings of fact are adequately supported by the record and that the trial court followed the statutory sentencing procedure and imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, then we may not modify the sentence "even if we would have preferred a different result." <u>State v. Fletcher</u>, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

At the sentencing hearing, the State adduced proof that the appellant had two previous

convictions in South Carolina for assault and battery of a high and aggravated nature, for which the appellant had received two ten-year sentences. Additionally, the appellant had a South Carolina conviction for driving while under the influence, for which the appellant received a one-year sentence, and a conviction for misdemeanor drug possession.

The appellant disclosed to the presentence investigator that he had abused alcohol and used illegal drugs, Xanax and marijuana, on a near daily basis for many years. The appellant's mother, Brenda Bagwell Epps, also testified regarding the appellant's long-term alcohol and drug abuse, which began in 1985. Epps stated that the appellant had attended treatment programs without success. However, Epps believed that the appellant was more amenable to treatment since his incarceration on the instant charges. A psychological report prepared by Dr. William Daniel and introduced at the sentencing hearing concluded that much of the appellant's criminal history stemmed from his illegal drug use.

The trial court found that, based on the appellant's two assault and battery convictions, the appellant was a Range II offender. The trial court found that the appellant's sentence should be further enhanced based upon his convictions for driving while under the influence and drug possession, as well as for his admitted long term illegal drug use. The appellant urged the court to mitigate his sentence because strong provocation existed for the offense, substantial grounds existed to excuse or justify the appellant's criminal conduct, and the appellant's mental condition and ability to react were affected by years of untreated substance abuse. The trial court considered the mitigating factors requested by the appellant and concluded that they should be given little or no weight. Moreover, the court noted that there was no evidence that the appellant was so intoxicated at the time of the offense that his decision making ability was impaired. Thus, the trial court imposed the maximum sentence of eight years.

On appeal the appellant argues that the sole enhancement factor did not justify the imposition of an eight-year sentence. Further, the appellant argues that the trial court erred in failing to apply the requested mitigating factors.

The trial court found that the appellant was a Range II multiple offender. On appeal, the appellant does not challenge this designation. We conclude that the record fully supports this determination. See Tenn. Code Ann. § 40-35-106(a)(1) and (5) (2003). Accordingly, the appellant was to be sentenced for his Class D felony conviction within a range of four to eight years. Tenn. Code Ann. § 40-35-112(b)(4) (2003).

The trial court found only one applicable enhancement factor, namely that the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range. Tenn. Code Ann. § 40-35-114(2) (2003). As we noted earlier, the appellant, in addition to the two felony convictions for assault and battery, has convictions for driving while intoxicated and misdemeanor possession of drugs. Further, as the trial court noted, the appellant has a lengthy history of illegal drug use. Therefore, the trial court properly applied this enhancement factor.

The appellant argues that the trial court erred in failing to apply the following mitigating factors:

> (2) The appellant acted under strong provocation;
>
> (3) Substantial grounds exist tending to excuse or justify the appellant's criminal conduct, though failing to establish a defense; and
>
> (13) The appellant's mental condition, specifically because many years of untreated substance abuse dulled the appellant's functioning and response time.

Tenn. Code Ann. § 40-35-113(2), (3), and (13) (2003).

The trial court stated that it would not apply mitigating factors (2) or (3), finding that "in his statement he was acting in self-defense . . . and the jury rejected that, and the facts of the offense do not support that version." The court noted that the facts and circumstances at trial supported Enloe's version of events. Taking this finding into consideration, we conclude that the trial court did not err in failing to mitigate the appellant's sentence based upon either mitigating factor (2) or (3).

At the sentencing hearing, the appellant argued that

> the non-statutory mitigating circumstance is [the appellant's] mental state. I have, as the Court knows, asked that a psychological evaluation be done. He was not functioning on a level that he has the ability to function on. His function and his reactions, I think the Court can see, were dulled by close to twenty years of alcohol and drug abuse.

The court found that although the record reflected that the appellant's long term drug abuse should be considered, there was no evidence in the record that the appellant was so intoxicated at the time of the offense that his ability to make decisions was impaired. The trial court found that the enhancing factor significantly outweighed any mitigation because of the substance abuse disorder and justified an eight-year sentence, the maximum in the range. We agree.

### III. Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE